**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| **DGA ENTERPRISES, LLC,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action** |
| | ) | **No. 1:07-cv-10962-RGS** |
| | ) | |
| | ) | |
| **CHURCH & DWIGHT CO., INC.,** | ) | |
| | ) | **JURY DEMAND** |
| **Defendant.** | ) | |
| | ) | |

_____

# <u>REDACTED VERSION</u>

## DGA'S MEMORANDUM IN OPPOSITION
## TO CHURCH & DWIGHT'S MOTION FOR SANCTIONS

Raymond P. Niro
Sally Wiggins
Niro, Scavone, Haller & Niro
181 West Madison, Suite 4600
Chicago, Illinois 60602
(312) 236-0722
(312) 236-3137 Facsimile

Bruce A. Singal
Michelle R. Peirce
Donoghue, Barrett & Singal, P.C.
One Beacon Street
Boston, Massachusetts 02108-3113
(617) 720-5090
(617) 720-5092 Facsimile

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     DGA'S CONFIDENTIAL DISCLOSURES TO C&D ..................................................... 3

III.    Church & Dwight's Attacks on DGA's Trade Secret Definitions are Without Merit ........ 4

   A.   C&D's Own Cases Do Not Support its Attempt to Evade Discovery ............................... 4

   B.   Church & Dwight Misapprehends Which Specific Trade Secrets Are Defined in
        in DGA's July 11, 2008 Supplemental Interrogatory Response ......................................... 6

   C.   DGA's "Combination" Technical Trade Secrets Are Well-Recognized ........................... 8

   D.   DGA's Supplemental Answer Is Sufficiently Particularized............................................ 10

   E.   DGA Provided "Additional Detail" ................................................................................. 12

   F.    DGA's Trade Secrets and Discovery Requests
         Clearly Define the Scope of Relevant Discovery ............................................................ 12

   G.   C&D's Speculation About "65,000 Unidentified Trade Secrets" Is Wrong .................... 15

   H.   C&D's Accusation That DGA Disclosed Only "Problems, Not Solutions" Is Baseless.. 15

   I.    C&D's Charge That The Prototype Was Not "Produced" Is Incorrect ............................ 17

   J.    C&D's Complaints About Identification of "Trade Secrets" Have Nothing To Do With
         Six of the Seven Counts of DGA's Complaint ............................................................... 17

IV.     CONCLUSION.................................................................................................... 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page(s)**

*Biodynamic Technologies, Inc. v. Chattanooga Corp.*,
644 F. Supp. 607 (S.D. Fla. 1986) ...................................................................................11

*Branch v. FDIC*,
825 F. Supp. 384 (D. Mass. 1993) ...................................................................................18

*Commonwealth of Massachusetts v. Mylan Laboratories*,
357 F. Supp. 2d 314, 321 (D. Mass. 2005) .....................................................................18

*Data General Corp. v. Grumman Systems Support Corp.*,
825 F. Supp. 340, 358 (D. Mass. 1993) ...........................................................................10

*Forro Precision, Inc. v. IBM Corp.*,
673 F.2d 1045 (9th Cir. 1982) .........................................................................................11

*General Electric Co. v. Sung*,
843 F. Supp. 776 (D. Mass. 1994) .....................................................................................9

*Hickman v. Taylor*,
329 U.S. 495 (1947)..........................................................................................................14

*IMAX Corp. v. Cinema*,
152 F.3d 1161 (9th Cir. 1998) ...........................................................................................5

*Illuminations, Inc. v. Waldoroth Label Corp.*,
1981 U.S. Dist. LEXIS 13357 (D. Mass. 1981) ...............................................................9

*qad, Inc. v. ALN Associates Inc.*,
1990 U.S. Dist. LEXIS 7458 (N.D. Ill. 1990) ..................................................................4

*Incase Corp. v. Timex Corp.*,
488 F.3d 46 (1st Cir. 2007)..............................................................................................19

*LFE Corp. v. Drytek, Inc.*,
1983 U.S. Dist. LEXIS 16098 (D. Mass. June 21, 1983) ...............................................13

*Michelson v. Digital Financial Services*,
167 F.3d 715 (1st Cir. 1999)............................................................................................19

*Nautilus Group, Inc. v. Icon Health and Fitness, Inc.*,
308 F. Supp. 2d 1208 (W.D. Wash. 2003) ................................................................19

*North American Specialty Insurance Co. v. Lapalme*,
258 F.3d 35 (1st Cir. 2001) ......................................................................................19

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978) ................................................................................................14

*Package Machinery Co. v. Hayssen Manufacturing Co.*,
164 F. Supp. 904, 906 (E.D. Wis. 1958) ...................................................................4

*Picker International Corp. v.  Imaging Equipment Services, Inc.*,
931 F. Supp. 18 (D. Mass. 1995) ..............................................................................8

*Qestec, Inc. v. Krummenacker*,
367 F. Supp. 2d 89 (D. Mass. 2005) ........................................................................18

*Storage Technology Corp. v. Custom Hardware Engineering & Consulting Inc.*,
2005 U.S. Dist. LEXIS 1630 (D. Mass. 2005) .........................................................10

*Tan-Line Studios, Inc. v. Bradley*,
1986 U.S. Dist. LEXIS 27754 (E.D. Pa. 1986) .......................................................11

*TouchPoint Solutions, Inc. v. Eastman Kodak Co.*,
345 F. Supp. 2d 23 (D. Mass 2004) .........................................................................10

*Trent Partners v. Digital Equipment Corp.*,
120 F. Supp. 2d 84 (D. Mass. 1999) ........................................................................19

*Unisplay S.A. v. American Electronic Sign Co.*,
1993 U.S. Dist. LEXIS 21331 (E.D. Wa. 1993) ......................................................11

*Utah Med. Prod., Inc. v. Clinical Innovations Assocs., Inc.*,
79 F.Supp. 2d 1290 (D.Utah. 1999) ..........................................................................5

*Xerox Corp. v. IBM*,
64 F.R.D. 367 (S.D.N.Y. 1974) .................................................................................5

*Young Dental Manufacturing Co. v. Q3 Special Products, Inc.*,
891 F. Supp. 1345 (E.D. Mo. 1995) ..........................................................................5

## STATE CASES

*Cambridge Internet Solutions, Inc. v. The Avicon Group*,
1999 Mass. Super. LEXIS 387 at *5 (Mass. Superior Ct. 1999) ...............................10

*Jet Spray Cooler, Inc. v. Crampton*,
385 N.E.2d 1349 (Mass. 1979) ...............................................................................................8

*Staffbridge, Inc. v. Gary G. Nelson Associates, Inc.*,
2004 Mass. Super. LEXIS 215 at *5-*6 (Mass. Super. Ct. June 11, 2004)..................................19

*USM Corp. v. Marson Fastener Corp.*,
393 N.E.2d 895 (Mass. 1979) ...........................................................................................9, 18

## FEDERAL STATUTES

Fed.R.Civ.P. 26(a) .............................................................................................................1

Fed.R.Civ.P.56 ...............................................................................................................18

## STATE STATUTES

Mass. Ann. Laws. ch. 93A, §42 (2008) ...................................................................................10

Mass. Ann. Laws. ch. 266, § 30(4) (2008) ...............................................................................10

Mass. Gen. L. Ch. 93A, § 2 ................................................................................................19

## I.   <u>INTRODUCTION</u>

In the 14 months this case has been pending, Church & Dwight (C&D) has defied not only DGA's discovery requests but even the mandatory disclosure requirements of Fed.R.Civ.P. 26(a).  C&D has refused to produce any witnesses for deposition on any responsive documents – not a single scrap of paper.  Faced with this Court's June 20, 2008 order directing C&D to produce the documents sought by DGA and to answer DGA's Interrogatories Nos. 1 and 6, C&D remains obdurate and now explains that it decided to disregard the Court's order because, according to C&D, it can't figure out what discovery is relevant as a result of its alleged inability to understand which DGA trade secrets it stands charged with misappropriating.   C&D's argument is fatally flawed on many levels.

First, DGA's Complaint (Exhibit A) includes seven tort and contract counts against C&D, only one of which is a claim for trade secret misappropriation.  The other six counts do not depend, as a matter of law and fact, upon the existence of trade secrets (see Section III(J), below).  Even if DGA had never disclosed a single trade secret to C&D (which is not the case), C&D is still in violation of both Fed.R.Civ.P. 26(a) and this Court's June 20, 2008 order.

Second, C&D does not discuss or even acknowledge the specificity of DGA's discovery requests (Exhibit B).  DGA's discovery requests are clear and specific and directed exclusively to the disclosures DGA made to C&D in writing and at an all-day meeting on March 1, 2006 with five C&D senior engineers.  As shown in Section III(F), below, the DGA document request C&D professes to be unable to understand is limited to the circumstances surrounding those disclosures and C&D's subsequent introduction of its "Fridge Fresh" deodorizer – a product clearly derived from DGA's ideas, which C&D brought to the market in May 2006, ██████████ ██████████████████████████████████████████████████████████████  All the discovery DGA seeks on those subjects – and which C&D has refused to provide for more than 6

1

months – is relevant equally to DGA's six claims that do not require the existence of trade secrets.

Third, C&D's professed inability to understand what trade secrets DGA is asserting in Count I of its Complaint is untenable, especially following C&D's supplemental interrogatory response on July 11, 2008 (Exhibit D). ███████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ See Section III(B), below.  DGA has identified its trade secrets with more-than-adequate specificity under controlling law (see Section III(D), below).

Fourth, C&D's lead cases (notably Package Machinery and qad, Inc.) support DGA, not C&D.  In those cases (and in most of the other decisions upon which C&D's motion is based), the trade secret owners had conducted extensive discovery *before* having to face any requirement to further particularize their trade secret definitions.  See Section III(A), below.

C&D's other excuses are equally meritless. ████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ███████████████ And C&D demanded, and was given, exclusive possession of DGA's prototypes for *seven weeks*, during which period C&D misused the prototypes to develop its "Fridge Fresh" product.  C&D's argument that it can't understand DGA's trade secrets because

2

"the prototype was not produced" is nonsensical (see Section III(I), below).  C&D's motion should be denied.

## II.   <u>DGA'S CONFIDENTIAL DISCLOSURES TO C&D</u>

DGA's principals, Daniel and Alyssa Gusenoff, are inventors and entrepreneurs from Boston who formed DGA in September 28, 2004 to among other things develop a new deodorizer product they had created (Alyssa Gusenoff has also enjoyed success with "Mocktails for the Mom-To-Be," a book of recipes for alcohol-free drinks).  As set forth in more detail in DGA's Complaint, (Exhibit A), after Mr. and Mrs. Gusenoff approached C&D with their proposed product, C&D invited the Gusenoffs to a meeting with five top-level C&D engineers, which occurred on March 1, 2006.  At the meeting, Dan Gusenoff disclosed to C&D one of their working prototypes, (Exhibits E and H), along with DGA's then-confidential patent application (Exhibit F) and a variety of confidential business plans and concepts.  At C&D's request, DGA even left one of its prototypes with C&D (Exhibit H).  Encouraged by C&D's expressions of interest at the meeting (for example, C&D's R&D Director Raymond Brown's statement that the Gusenoff's "timing is right" for their new product), DGA sent additional data and entered into a "Confidentiality Agreement" with C&D which memorialized the parties' previous understanding that all disclosures were confidential (Exhibit G, Agreement).  Two weeks after the meeting, C&D Research Manager Benny Yam asked DGA for a *second* prototype; DGA complied and sent another working prototype to C&D (Exhibit H).

C&D never disclosed to DGA before, during or after the March 1, 2006 meeting the claim C&D now makes in this lawsuit (Exhibit M) that it was developing its own product at the same time. ██████████████████████████████████████

███████████████████████████████████████████████████████

███ No further explanation of C&D's actions was ever provided – and C&D's current motion is the latest attempt to shield its actions from the gaze of DGA and of this Court.

In 2006, C&D introduced its "Fridge Fresh" deodorizer. Recognizing it as a knock-off of DGA's prototypes, DGA was left with no alternative but to file this lawsuit.

### III.  CHURCH & DWIGHT'S ATTACKS ON DGA'S TRADE SECRET DEFINITIONS ARE WITHOUT MERIT

#### A.  C&D's Own Cases Do Not Support its Attempt to Evade Discovery

C&D's fundamental premise – that a trade secret claim must be dismissed unless the trade secrets are defined in exhaustive detail before the defendant need even provide any discovery – is not supported, even by the cases upon which C&D relies. In the very first case cited by C&D (Br. at p. 5), Package Machinery Co. v. Hayssen Manufacturing Co., 164 F. Supp. 904 (E.D. Wis. 1958), the plaintiff had taken extensive discovery from the defendant before the Court ultimately ruled that the trade secrets still had not been adequately defined:

> Plaintiff, both before and after the pre-trial conference, and prior to the various motions requiring plaintiff to specify the trade secrets it claimed were pirated, held extensive discovery proceedings. In addition to regular depositions, it examined drawings, blue prints, models and equipment at defendant Hayssen Co.'s plant in detail.

Id. at 906. C&D, here, denies DGA the very discovery that the plaintiff had been granted in Package Machinery. Similarly, in qad, Inc. v. ALN Associates Inc., 1990 U.S. Dist. LEXIS 7458 (N.D. Ill. 1990) (C&D Br. 7), the plaintiff also was able to take discovery from the defendant before being required to particularize its trade secrets:

> What of the later situation at the time that qad filed its more recent Amended Complaint embodying the same claim? By then qad was in a position to know just what qad property ALN had obtained – *this Court had compelled*

4

> ***[defendant] ALN to turn over those materials before it would finally require [plaintiff] qad to provide the particularized showing that a trade secrets claim calls for.*** Nonetheless qad's counsel still reasserted the trade secrets claim at that point, under the obvious (though mistaken) view that qad could simply persist in the blunderbuss statement that "Everything you got from us was a trade secret."

Id. at *7 (emphasis added) (citation omitted).  In contrast to qad, where extensive discovery had been taken from the defendant, C&D has stonewalled, refusing to produce even a single document or a single witness in response to DGA's discovery requests and defying this Court's June 20, 2008 Order.   And here, again in contrast to qad, C&D has already specifically particularized its combination trade secrets claims (see Section III(C), below, discussing DGA's combination trade secrets Nos. 2-5).

C&D's other cases (C&D Br. 7-8) like Package Machinery and qad allow the plaintiff discovery.  See, e.g, Xerox Corp. v. IBM, 64 F.R.D. 367, 371, 375 (S.D.N.Y. 1974) (stating that plaintiff should "after nearly a year of discovery" and taking more than "23 depositions" be able to identify the trade secrets misappropriated by defendant); IMAX Corp. v. Cinema, 152 F.3d 1161, 1165, 1168 (9th Cir. 1998) (summary judgment decision following benefit of pretrial discovery); Young Dental Mfg. Co. v. Q3 Special Products, Inc., 891 F. Supp. 1345, 1349-51 (E.D. Mo. 1995) (decided following full discovery; deposition testimony quoted in opinion); Utah Med. Prod., Inc. v. Clinical Innovations Assocs., Inc., 79 F.Supp. 2d 1290 (D.Utah 1999).

C&D's motion, therefore, is unsupported by C&D's own cases, whose holdings support DGA, not C&D:  in C&D's cases, the plaintiffs were granted extensive discovery before being required to particularize their trade secrets and being penalized for failing to do so ***after*** taking discovery.

### B.  Church & Dwight Misapprehends Which Specific Trade Secrets Are Defined in DGA's July 11, 2008 Supplemental Interrogatory Response

The arguments at pp. 8-13 of C&D's brief reveal that C&D misapprehends (or deliberately mischaracterizes) which trade secrets DGA identified in response to the Court's June 20, 2008 Order.  To begin with, C&D ignores the question posed by its own interrogatory:

> Identify and describe in specific factual detail ***all DGA Information and*** DGA Trade Secret(s).

(C&D Interrogatory, p. 1, Exhibit I) (emphasis added).  Thus, C&D's interrogatory demanded a listing, without distinction, of both "trade secrets" ***and*** "all DGA information."  C&D's interrogatory was not limited to trade secrets; nor did it call for their isolation from the more-general category of "all DGA information."  Accordingly, DGA's initial response to this interrogatory included a large number of items that were never claimed to qualify as "trade secrets" – just as C&D's own interrogatory required.

When on July 11, DGA supplemented its interrogatory response in compliance with the Court's June 20 Order, DGA did identify the items it specifically claims as trade secrets – the list begins on p. 10 of DGA's Response and is captioned "First Supplemental Response" (Exhibit D).  Although C&D complains that DGA did not "withdraw" its previous answer (C&D Br. p. 5 n.3), as shown above there was no call to "withdraw" the previous answer to a different, and broader, question.  DGA's identification of trade secrets does not incorporate nor depend on any of the broader list of "all DGA information" that appears at pp. 1-10 of the response.

C&D also mischaracterizes or misapprehends the supplemental portion of DGA's answer, which begins at p. 10 of Exhibit D.  ███████████████████████████

███████████████████████████████████████████████████

6





[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

(Campau Dec. ¶¶ 7-8, Exhibit J).

### C.  DGA's "Combination" Technical Trade Secrets Are Well-Recognized

Even if each and every element of an idea, device or process is known in the industry, the combination or inter-relation of those elements may be a trade secret if the combination gives the owner a competitive advantage.  See, e.g., Jet Spray Cooler, Inc. v. Crampton, 385 N.E.2d 1349, 1356 (Mass. 1979) ("The fact that a process is the combination and adaptation of old principles to new purposes does not prevent the process from being a trade secret if the process as distilled accomplishes a result which gives the holder a competitive advantage due to his own ingenuity, research and development.  Moreover, 'the fact that the secret was easy to duplicate does not militate against its being a trade secret.  The important point is that the owner and those to whom it was necessary to reveal the secret knew of the trade secret.'"); Picker International Corp. v.

8

Imaging Equipment Services, Inc., 931 F. Supp. 18, 38 (D. Mass. 1995) ("Generally, a compilation of information which is used in a business can be a trade secret.  A compilation of public information is protected if that information is, as a result of a business' efforts, combined in a unique way.") (citations omitted); Illuminations, Inc. v. Waldoroth Label Corp., 1981 U.S. Dist. LEXIS 13357 at *7 (D. Mass. 1981) ("It would appear that a unique adaptation of products already on the market and used in the trade constitute a trade secret."); USM Corp. v. Marson Fastener Corp., 393 N.E.2d 895, 897 (Mass. 1979) ("…the development of the USM machine involved considerable time, effort and expense, ... its 'combination [of features] was unique and effective when devised and…did not constitute a matter of public knowledge or of general knowledge in the industry.'  Therefore, ... the USM machine was of an appropriate nature to qualify it as a trade secret.") (citation omitted).

█████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████ And, of course, C&D would remain liable for misappropriating DGA's trade secrets even if C&D modified the trade secrets, or made additions of its own.  USM, 467 N.E.2d at 1284 ("Modifications in the process do not relieve a defendant of responsibility if the defendant's process is substantially derived from the trade secret."); General Electric Co. v. Sung, 843 F. Supp. 776, 779 (D. Mass. 1994); Restatement (Third) Of Unfair Competition §40, comment (c) (1993).

9

**D.  DGA's Supplemental Answer Is Sufficiently Particularized**

Massachusetts law defines "trade secret" very broadly to encompass both tangible things (such as the DGA prototypes involved in this lawsuit) and information, including both technical data like DGA's patent application and merchandising plans.

> The term "trade secret" as used in this paragraph means and includes anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement.

Mass. Ann. Laws. ch. 266, § 30(4) (2008).  This is the definition of "trade secret" that applies to civil trade secret misappropriation lawsuits.  Mass. Ann. Laws. ch. 93A, §42 (2008).  The "trade secrets" that have been identified by DGA satisfy this definition.

In <u>TouchPoint Solutions, Inc.</u> v. <u>Eastman Kodak Co.</u>, 345 F. Supp. 2d 23, 28 (D. Mass 2004), for example, the court rejected the defendant's argument that the "source code, implementation, overall design and 'distributed computing model'" was too ill-defined to qualify as a trade secret.  Similarly, in <u>Data General Corp.</u> v. <u>Grumman Systems Support Corp.</u>, 825 F. Supp. 340, 358-359 (D. Mass. 1993), the court held that a trade secret described simply as "MV/ADEX" was sufficiently particularized to go to the jury to consider whether it was misappropriated.   The court explicitly rejected the defendant's argument that it was necessary to identify specific lines or sections of the source code in order to properly identify trade secrets. <u>Id.</u> at 358.  In <u>Storage Technology Corp.</u> v. <u>Custom Hardware Engineering & Consulting Inc.</u>, 2005 U.S. Dist. LEXIS 1630 at *3-*4 (D. Mass.  2005), the court rejected a demand for more-specific identification of trade secrets, holding that "the rules do not sanction of degree of detail [defendant] seeks to extract."  And, in <u>Cambridge Internet Solutions, Inc.</u> v. <u>The Avicon Group</u>,

1999 Mass. Super. LEXIS 387, at *5 (Mass. Superior Ct. 1999), cited by C&D, the Court held

that the identification of a specific document – a "business plan" was held sufficient to satisfy

any requirement for specific identification of trade secret:

> In the case of Business Plan, C-Bridge has provided the requisite degree of
> specificity.  The business plan has been identified by C-Bridge as a single written
> document that was removed by Leary and Peters when they left C-Bridge to form
> Avicon.

Id. at *5.  See also, Unisplay S.A. v. American Electronic Sign Co., 1993 U.S. Dist. LEXIS

21331, *13 (E.D. Wa. 1993) (accepting such trade secrets described as "Specific cost estimates

for shutters" and "specific expense and profit estimates" as sufficiently detailed); Tan-Line

Studios, Inc. v. Bradley, 1986 U.S. Dist. LEXIS 27754, *20 (E.D. Pa. 1986) ("Tan-Line's entire

methodology for conducting a tanning studio constitutes a trade secret.  Therefore, plaintiff need

not identify with specificity those individual aspects of Tan-Line's business about which Mr.

Bradley appropriated information."); Forro Precision, Inc. v. IBM Corp.,  673 F.2d 1045, 1057

(9th Cir. 1982) (plaintiff's reference to "dimensions and tolerances" was sufficiently specific

where defendant had obtained materials embodying the trade secrets).

   Here, as in Cambridge Internet Solutions, DGA has identified a number of specific

documents and physical prototypes which were disclosed to C&D and misappropriated,

including the two DGA prototypes; DGA's confidential patent application and DGA's

animation.  The identification of those specific items, even without more, placed C&D on notice

of the trade secrets it is charged with misappropriating.  Indeed, C&D's use of DGA's patent

application was strikingly similar to that in Biodynamic Technologies, Inc. v. Chattanooga

Corp., 644 F. Supp. 607 (S.D. Fla. 1986):

In addition, this Court believes that the Defendant's access to and inspection of the Plaintiff's patent application facilitated their endeavor to design and market a copy of the Powerflex unit.  The use of a patent application to manufacture and/or sell articles embodying the invention gives rise to liability for the damages resulting therefrom.  Such liability does not derive from the patent statutes, but from a claim for unfair competition and for misappropriation of secret information.

Id. at 612 (citation omitted) (emphasis added).

### E.  DGA Provided "Additional Detail"



### F.  DGA's Trade Secrets and Discovery Requests
### Clearly Define the Scope of Relevant Discovery

The basic premise of C&D's motion – that it cannot determine the scope of relevant discovery because of alleged inadequacies in the identification of DGA's trade secrets – is simply not plausible.  As Mr. Campau explains:





[redacted]

(Campau Dec. ¶¶ 29-30, Exhibit J).

In LFE Corp. v. Drytek, Inc., 1983 U.S. Dist. LEXIS 16098 (D. Mass. June 21, 1983), the court faced a situation similar to DGA's dealings with C&D. Former employees from the plasma marketing department of LFE, the trade secret owner, resigned from LFE to form a new corporation (Drytek). LFE, the trade secret owner, propounded document requests directed specifically to materials created by the former employees while working at LFE. Id. at *5-*6.

The defendants who were accused of trade secret misappropriation (Drytek and the former employees) responded just as C&D has done here: they refused to produce any documents because of alleged "excessive burden," stating:

> Drytek responds as follows: once plaintiff identifies with specificity the trade secrets it claims defendants have appropriated, defendants will provide the documents requested insofar as the same pertain to those trade secrets.

Id. at 6.  Rejecting Drytek's argument, the court held:

> Given the allegations of the Complaint and that the [former employees] were employed in that section of the plaintiff's business which developed and marketed plasma etchers, I frankly do not see how there could be any possibility that what the plaintiff requests, i.e. diagrams, etc., made by Zafiropoulo and Maher of the plasma etchers they manufactured after leaving the plaintiff's employ, would be found to be either "irrelevant" or "burdensome" in this litigation.  As I noted in my order allowing the motion, the Supreme Court has defined relevance for discovery purposes as encompassing "... any matter that bears on, or that reasonably could lead to any other matter that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 1 (1978), citing Hickman v. Taylor, 329 U.S. 495, 501 (1947).
>
> Thus, although I do not question the good faith of counsel for the defendants, I cannot see substantial justification for the stated objections to these four document requests.

Id. at *6-*7.  Here, too, there is no "substantial justification" for C&D's position.

C&D led DGA and its principals to believe that cooperation and disclosure of their trade secrets and confidential information would lead to future benefits.  Just as in LFE, the scope of disclosure – and the scope of the DGA document requests to which C&D has objected – are not subject to any reasonable doubt, nor to any realistic charge of excessive burden or irrelevance. As Mr. Campau has explained, ██████████████████████████████ ████████████████████████████████████████████████ And here, just as in LFE, because of the prior relationship between DGA and C&D, DGA cannot know, in the

14

absence of discovery, all of the trade secrets and confidential information that have been misappropriated by C&D. As in LFE, in this instance C&D's refusal to produce documents on the pretext of alleged lack of specificity of the trade secrets is unjustified.

### G. C&D's Speculation About "65,000 Unidentified Trade Secrets" Is Wrong

[redacted]

[redacted]

[redacted]

### H. C&D's Accusation That DGA Disclosed Only "Problems, Not Solutions" Is Baseless

Comparing DGA's trade secrets to "selecting a drug such that it cures cancer without side effects" (C&D Br. 12), C&D asserts that DGA proposed "problems, not solutions." This ignores the fact that DGA disclosed working prototypes (Exhibit H), an animation (Exhibit K) and a

detailed U.S. patent application (Exhibit L) to C&D, and that C&D retained the first prototype for seven weeks and even demanded C&D send it a second prototype during that period. If the prototypes were "problems, not solutions," why keep them for seven weeks of study? Why did C&D ask DGA to send a second prototype – so it could see more problems? Finally, C&D's "drug" hypothetical would look different if it were accompanied by samples of a drug that ***did*** cure cancer.

The problem solved by DGA's design was not trivial. [redacted]

[redacted]

[redacted]

[redacted]



(Campau Dec. ¶¶ 15-16, Exhibit J).   In short, DGA disclosed "solutions," and C&D misappropriated them.

### I.   C&D's Charge That The Prototype Was Not "Produced" Is Incorrect

The DGA prototypes (Exhibit H), together with the animation and the then-confidential DGA patent application (Exhibits K, L), were key items that permitted C&D to misappropriate DGA's trade secrets.  ████████████████████████████████████

████████████████████████████████████████████████████

Tacitly acknowledging its importance, C&D disingenuously complains that DGA did not "produce a physical prototype" (C&D Br. p. 6.n.4).  Not so.  In fact, not only has C&D admitted that it spent almost two months examining the prototypes given to it by DGA (Answer, ¶¶ 23-23, 29, Exhibit M), C&D also ***turned down*** DGA's offer of further inspection when C&D unilaterally canceled the Rule 30(b)(6) deposition of DGA (Ganz Letter, Exhibit N), at which the prototypes were to be presented (Schedule A at ¶4, Exhibit O) so C&D could depose DGA's Rule 30(b)(6) witness about them.  DGA also produced photos of the physicals in this case. (Exhibit P).  In short, C&D had seven weeks of unlimited possession of the prototypes; and then it turned down the opportunity for still further inspection.  Its assertion that the prototypes were not "produced" says more about C&D's attempt to evade the issue than it does about the prototypes themselves.

### J.   C&D's Complaints About Identification of "Trade Secrets" Have Nothing To Do With Six of the Seven Counts of DGA's Complaint

Even though its gripes are strictly limited to the identification of "trade secrets," C&D ends its brief by asking this Court to "dismiss the complaint in its entirety, with prejudice" (C&D Br. 16).  Apparently hoping the Court will not even read the Complaint, C&D ignores the causes

17

of action that are asserted in six of the seven counts.  Nothing is said by C&D about how those

counts are pleaded, nor about the facts supporting them.  Under the law, counts II through VII of

the Complaint do not depend upon the existence of "trade secrets" and, accordingly, could not be

dismissed even if the Court were to conclude that DGA had no "trade secrets" (a conclusion that

it would be inappropriate to reach without adjudicating a summary judgment motion, with all the

procedural protections against imprudent dismissal provided by Fed.R.Civ.P.56).

> **Unjust Enrichment (Count II)**  "To satisfy the elements of unjust enrichment, a
> plaintiff must show: (1) an enrichment; (2) an impoverishment; (3) a relation
> between the enrichment and the impoverishment; (4) an absence of justification
> and (5) the absence of a remedy provided by law.  Liability in unjust enrichment
> involves a showing that wealth is in one persons's [sic] hands when it should be in
> another's."[1]

> **Breach of Fiduciary Duty (Count III)** "A claim for breach of fiduciary duty has
> four elements: 1) existence of a fiduciary duty arising from a relationship between
> the parties, 2) breach of that duty, 3) damages and 4) a causal relationship
> between the breach and the damages."[2]

> **Theft of Idea (Count IV)**  "A plaintiff who may not claim trade secret protection
> either because it failed to take reasonable steps to preserve its secrecy or because
> the information, while confidential, is only 'business information,' may still be
> entitled to some relief against one who improperly procures such information. ...
> [I]mproper means used to gain information is a separate basis of liability,
> regardless of whether the information constitutes a technical trade secret."[3]

> **Breach of Contract (Count V)** "To succeed on his breach of contract action,
> Michelson must demonstrate: (1) that the parties reached a valid and binding
> agreement with regard to variable incentive compensation; (2) that DFS breached

---

[1] Commonwealth of Massachusetts v. Mylan Laboratories, 357 F. Supp. 2d 314, 324 (D. Mass. 2005).  See also, Branch v. FDIC, 825 F. Supp. 384, 411 (D. Mass. 1993) ("unjust enrichment" claim may relate to a breach of fiduciary duty).

[2] Qestec, Inc. v. Krummenacker, 367 F. Supp. 2d 89, 97 (D. Mass. 2005).

[3] USM Corp. v. Marson Fastener Corp., 393 N.E.2d 895, 903 (Mass. 1979).

the terms of the VIC aspect of the agreement; and (3) that Michelson suffered damages from the breach."[4]

**Alternative Claim for Fraud (Count VI)** To prove fraud, "a plaintiff must prove that the defendant made a false representation of material fact with knowledge of its falsity, that the defendant made the statement for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon that statement to his or her detriment."[5]

**Violation of Mass. Gen. L. Ch. 93A, § 2 and/or § 11 (Count VII)** The existence of "trade secrets" is not an element of a claim for unfair or deceptive practices.[6]

C&D's brief disregarded the allegations of Counts II through VII and C&D is now barred from remedying that defect in any reply brief.  North American Specialty Insurance Co. v. Lapalme, 258 F.3d 35, 45-46 (1st Cir. 2001) (refusing to consider arguments that "flagrantly violated" that principle); Nautilus Group, Inc. v. Icon Health and Fitness, Inc., 308 F. Supp. 2d 1208, 1214 (W.D. Wash. 2003) (striking new evidence submitted with reply brief).

Six of the seven counts here do not depend on the existence of trade secrets.  Count II, Unjust Enrichment, only requires that DGA have conferred a benefit on C&D.  ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[4] Michelson v. Digital Financial Services, 167 F.3d 715, 720 (1st Cir. 1999); Staffbridge, Inc. v. Gary G. Nelson Associates, Inc., 2004 Mass. Super. LEXIS 215 at *5-*6 (Mass. Super. Ct. June 11, 2004) ("Count II of the complaint seeks relief for breach of the licensing agreement, a claim that does not necessarily require a trade-secret underpinning.").

[5] Trent Partners v. Digital Equipment Corp., 120 F. Supp. 2d 84, 108-09 (D. Mass. 1999); see also, Mylan Laboratories, 357 F.Supp.2d at 321.

[6] In Incase Corp. v. Timex Corp., 488 F.3d 46, 57 (1st Cir. 2007), the defendant engaged in deceptive acts through which it "was able to obtain design services for free."  "The district court found that Timex's use of the S-5 price flag design, while not misappropriation of a trade secret, was enough of an unfair and deceptive act to turn a garden-variety contract claim into violation of Chapter 93A."  Id. at 56.  The First Circuit affirmed, holding that: "the [district] court drew a direct line between the unethically procured free design services and the subsequent breach of the S-4 contract.  This is sufficiently unscrupulous to sustain a Chapter 93A claim."  Id. at 57.

█████████████████████████████████████████ Count III, Breach of Fiduciary Duty, depends upon DGA's misuse of its confidential relationship with DGA, a relationship that stems from the written agreement executed by the parties and from DGA's reasonable expectation that its dealings with C&D would be kept private.  Count IV, Theft of Idea, reflects the legal principle set forth in <u>USM</u>, holding that under Massachusetts law, there is liability for using improper means to gain information, even if the information does not qualify as a trade secret.  Count V, Breach of Contract, explicitly depends upon the written confidentiality agreement (Exhibit G).  That agreement is not limited to trade secrets, but encompasses all information disclosed between DGA and C&D.  Count VI, Fraud, relates to misappropriation which were made by C&D to induce DGA to disclose information misused by C&D developing its Fridge Fresh product.  Count VII, Violation of MGL AL § 93A, involves the unfair or deceptive acts committed by C&D in inducing DGA to disclose information and assist C&D in its development efforts.  Again, this Count does not depend upon the existence of trade secrets.

Counts II through VII, therefore, do not require the existence of trade secrets.  C&D's request to "dismiss the complaint in its entirety, with prejudice" (C&D Br. 16) is over-reaching that cannot be justified by any deficiencies in identification of trade secrets – and as shown above, there are no such deficiencies.

## IV.    <u>CONCLUSION</u>

C&D's motion should be denied, and the Court should reiterate its June 20, 2008 order requiring C&D to produce documents and should order C&D to produce witnesses noticed for deposition by DGA.

Respectfully submitted,


/s/Sally Wiggins_____
Raymond P. Niro
Sally Wiggins
Niro, Scavone, Haller & Niro
181 West Madison, Suite 4600
Chicago, Illinois 60602
(312) 236-0722
(312) 236-3137 Facsimile

Bruce A. Singal
Michelle R. Peirce
Donoghue, Barrett & Singal, P.C.
One Beacon Street
Boston, Massachusetts 02108-3113
(617) 720-5090
(617) 720-5092 Facsimile

***Attorneys for Plaintiff,***
***DGA Enterprises, LLC***

21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this document was filed through the ECF system on August 29, 2008 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Joseph A. Capraro, Jr.
Steven M. Bauer
Melissa A. Ganz
PROSKAUER ROSE LLP
One International Place, 22nd Floor
Boston, MA  02110-2600
Telephone:  (617) 526-9600
Facsimile: (617) 526-9899
jcapraro@proskauer.com

Theodore K. Cheng
Colin A. Underwood
PROSKAUER ROSE LLP
1585 Broadway
New York, NY  10036
Telephone:  (212) 969-3000
Facsimile: (212) 969-2900

/s/ Sally Wiggins_____
Sally Wiggins

22